UNITED STATES, Appellee

v.

EDWARD JOSEPH KNUDSON, Chief Engineman, U. S
Navy, Appellant

4 USCMA 587, 16 CMR 161

588

No. 3365

Decided August 6, 1954

 ██

CDR Raymond Van Wolkenten, USN, and LT Robert E. Hecht, USNR, for Appellant.
CDR Thomas E. Blade, USN, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A board of review affirmed the accused's conviction of sodomy and his sentence to a dishonorable discharge, total forfeitures, and confinement at hard labor for one year. We granted his petition for review to consider the effect of certain action taken by the convening authority.

The offense was committed on January 12, 1952, in the state of California. After referral of the charges to a general court-martial for trial, the accused was released to the California authorities for trial in a state court on an information alleging the same offense. On April 14, 1952, he was duly tried before a judge and jury in the Superior Court, County of San Diego, and was acquitted. On May 21, 1952, the military charges came on for hearing before a court-martial.

The law officer denied preliminary motions to dismiss the charge on the ground of double jeopardy, and that it was contrary to Navy policy to try an accused by court-martial when he had already been tried for the same offense by a civilian court. The accused then requested a continuance. The request was predicated upon the fact that, through regular naval channels, the accused had forwarded a letter addressed to the Secretary of the Navy, dated May 5, 1952, in which he referred to his acquittal by the California court and the Navy policy against a second trial by court-martial. The Secretary was requested to terminate the military proceedings against the accused. A week before the trial, the letter had passed the "second forwarding addressee," but the accused did not know whether it reached the office of the Secretary of the Navy. The accused conceded that he was "entirely prepared" to proceed on the merits. Although trial counsel vigorously argued against the motion, it was granted by the law officer. The court then adjourned sine die.

On May 26, 1952, the court reconvened. The following letter from the convening authority, dated May 23, 1952, addressed to the law officer, was read into the record

"COMMANDANT'S OFFICE
ELEVENTH NAVAL DISTRICT
SAN DIEGO 30, CALIFORNIA

23 May 1952

From: Commandant, Eleventh Naval District
To: Lieutenant Commander John J. Varni, USNR, Law Officer, General Court-Martial, Eleventh Naval District
Subj: Trial of Edward Joseph Knudson, ENC, U. S. Navy adjournment signed by, in the case of

1. A perusal of the record of the subject named man indicates that on 21 May 1952 you adjourned the subject case Sine die upon the request of the accused, because he had forwarded a letter through channels to the Secretary of the Navy requesting that he not be brought to trial by General Court-Martial.

2. The subject named man was ordered tried by the Commandant, Eleventh Naval District on 19 February 1952. To date this order has not been cancelled, nor has the delay by the Commandant been authorized.

3. Section 58a, Manual for Courts-Martial, United States, 1951, states:

**589**

'A court-martial may, for *reasonable cause*, grant a continuance to any party for such time and as often as may appear to be just.'

Section 58e states:

'Application should be made to the court if in session, otherwise to the convening authority, *but an application to the court for an extended delay, if based on reasonable cause may be released* [sic] *by the court to the convening authority.'*

The Naval Supplement to the Manual for Courts-Martial, United States, 1951, Par. 0102a(2), gives the Commandants of all Naval Districts authority to order General Courts-Martial.

4. The Commandant does not consider the desire of a man not to be tried a reasonable cause for delay. Although it is recognized that the Law Officer has wide discretion granting continuances or adjournments, the Commandant considers that whether or not Knudson is to be tried by General Court-Martial is an administrative decision and your ruling, therefore, is an abuse of discretion.

5. You are directed, unless there is reasonable cause for continuance, to resume the trial of Knudson as soon as practicable.

/s/ W. D. Baker

W. D. BAKER,
Rear Admiral, U. S. Navy,
Commandant,
Eleventh Naval District,
San Diego, California."

At the conclusion of the reading, the accused entered a plea in bar of trial on the ground that the convening authority's letter constituted illegal interference with, and coercion of, the law officer in the performance of his duties. The law officer noted that in his "personal view . . . it was not an abuse of discretion to grant the continuance," but he denied the plea and directed the trial to proceed. The accused entered a plea of not guilty and unsucceessfully defended the case on the merits. We must now determine whether the action of the convening authority prejudiced the accused in a substantial right.

Responsibility for the proper conduct of a general court-martial trial rests upon the law officer. With certain exceptions, his rulings on interlocutory questions are final and constitute the rulings of the court. Article 51, Uniform Code of Military Justice, 50 USC § 626. In the application ▄▄▄▄ of these principles, we have held that the determination of whether a request for a continuance should or should not be granted rests within the sound discretion of the law officer. United States v. Nichols, 2 USCMA 27, 6 CMR 27; United States v. Plummer, 1 USCMA 373, 3 CMR 107; see also: United States v. Sizemore, 2 USCMA 572, 10 CMR 70. The standard used in the exercise of that discretion is "reasonable cause." Article 40, Uniform Code of Military Justice, 50 USC § 615. Manual for Courts-Martial, United States, 1951, paragraph 58, page 82. A review of its exercise may be had only upon a clear showing that the discretion was abused. United States v. Plummer, supra.

A claim of abuse of discretion is usually reviewed on appeal as part of the entire case. In fact, we know of no authority in Federal judicial practice which permits an intermediate appeal for the sole purpose of reviewing that claim. Under Federal law, the right to appeal an interlocutory determination in a civil case does not include an appeal from a ruling on a continuance. 28 USC, Section 1292. In a criminal case an appeal lies only from the final decision. 28 USC, Section 1291. Rule 37, Federal Rules of Criminal Procedure. Copp v. United States, 168 F2d 190 (CA 1st Cir 1948) ; United States v. Domroe, 129 F2d 675 (CA2d Cir 1942). Moreover, the Government may appeal only if the final decision is adverse to it. See: 18 USC, Section 3731.

We have repeatedly held that Federal practice applies to courts-martial procedures if not incompatible with military law or with the special requirements of the military establishment. United States v. Fisher, 4 USCMA 152,

15 CMR 152. Therefore, unless military law or necessity required an intermediate review of the law officer's discretion in the grant or denial of a motion for continuance, the convening authority's action here was illegal.

The Government argues that the convening authority is authorized to control the grant of a continuance by the provisions of paragraph 58 of the Manual for Courts-Martial, United States, 1951. The pertinent parts of the paragraph read as follows:

"58. CONTINUANCES.—a. General.—A court-martial may, for reasonable cause, grant a continuance to any party for such time and as often as may appear to be just (Art. 40). There is no limit to the number of continuances which may be granted.

"b. Postponement of trial.—The necessity for a formal continuance may often be avoided by requesting the president to postpone the assembling of the court or by requesting the court to adjourn or to take a recess. As the law officer rules finally on any application for a continuance presented while the court is in session, the president of a general court-martial properly should obtain the advice of the law officer with respect to the request of a party for the postponement of the time for the assembling of the court.

. . . . . .

"e. Application and action thereon.—Application should be made to the court if in session, otherwise to the convening authority, but an application to the court for an extended delay, if based on reasonable cause, may be referred by the court to the convening authority.

"Although the proper time for making an application to the court is after the accused is arraigned and before he pleads, the court may permit it to be made at any other time."

At the outset, we are faced with a possible conflict between paragraph 58e of the Manual, and Article 40, Uniform Code of Military Justice, supra. The latter empowers the law officer, not the convening authority, to act on an application for a continuance. Therefore, it may be that even when the court is not actually in session, an application for a continuance should be made to the court and not to the convening authority. However, we need not now decide whether this provision in the Manual may properly be reconciled with the Code requirement. Here, the application was made while the court was in session, and, under both the Code and the Manual, the law officer was the proper person to rule on it. He granted the application. Under well-settled principles, his ruling was not subject to review until the trial had been completed; and then only if the ruling was prejudicial to the accused. See Manual, paragraph 58d, page 83.

Justification for the convening authority's action is also sought in that part of paragraph 58e, which provides that if the application is for "an extended delay . . . [it] may be referred by the court to the convening authority." This too presents a serious conflict between the Code and the Manual. In effect, the Manual provision appears to substitute the discretion of the convening authority for the judgment of the court. Again, however, we need not attempt to reconcile the two provisions.

The accused's application was not, in fact, referred to the convening authority for decision. Consequently, unless the Manual provision is to be construed as mandatory, the convening authority had no power or right to make any decision on the matter of a continuance. The language of the paragraph is plainly permissive and we find nothing in it which requires a forced construction. United States v. Merritt, 1 USCMA 56, 1 CMR 56.

Having no power to review the law officer's grant of a continuance, the convening authority should not inject himself into the proceedings. However honest may be his belief that he possesses the power, he cannot substitute his judgment for that of the law officer. He can refer the

**591**

charges to trial, and, if he wishes, he can in a proper case dissolve the court or change its personnel. However, none of these rights give him the power to control the law officer in the exercise of his statutory duties. In the words of the Manual, "An officer who has power to convene a general court-martial may determine the cases to be referred to it for trial and may dissolve it, but he cannot control the exercise by the court of the powers vested in it by law." Ibid, paragraph 5a(6), page 8.

The Code and the Manual give the convening authority certain rights of review in a few limited instances, when the court-martial has acted so as to terminate finally the proceedings against the accused without, however, making any finding on his guilt or innocence. Thus, if a specification is dismissed on the ground that it fails to state an offense, the convening authority may return the record to the court for reconsideration of the ruling and any further appropriate action. Article 62(a), Uniform Code of Military Justice, 50 USC § 649; Manual for Courts-Martial, United States, 1951, paragraph 67f, pages 98–99. See also: Manual, supra, paragraph 122b, page 203. However, these rights do not give the convening authority the power to review interlocutory rulings made by the court while the case is in progress; and this is particularly true when the Code expressly regulates the procedure, as it does in this case.

The record clearly shows that the law officer yielded to the pressure of the convening authority. "It is the personal view of the law officer," he said, "that it was not an abuse of discretion to grant the continuance when the continuance was granted." Nevertheless, he ordered the trial to proceed. In so doing, he abdicated his powers to the convening authority. Manifestly, this was error. United States v. Self, 3 USCMA 568, 13 CMR 124.

However, a finding of error is not conclusive; we must still consider the nature and effect of the error. We have held that not every erroneous ruling by the law officer requires application of the doctrine of general prejudice. Unit-

ed States v. Berry, 1 USCMA 235, 2 CMR 141; United States v. Self, supra. In the Self case we held that two appeals to the staff judge advocate for a ruling on issues presented to the president of a special court in the course of trial should be judged by the standards of specific prejudice. Thus, in this case we should determine whether the error prejudiced the accused in a substantial right.

When the charges were referred to trial by court-martial, two naval policies required consideration. First, the accused could not be released to state officials for trial in a state court without specific authorization from the Secretary of the Navy. Section 0702, Naval Supplement to the Manual for Courts-Martial, United States, 1951. This policy was important to the accused because under military law maximum confinement for the offense charged is five years, while under California law, it is fifteen years. California Penal Code, section 288a. We presume that the convening authority acted in accordance with the first policy before he turned over the accused to the California authorities.

The second policy provided that if an accused was convicted and punished by a state court he should not again be tried by court-martial for the same offense. CMO 1–1941, 22; CMO 5–1945, 203. A literal adherence to this policy may not have prevented further proceedings against the accused. On the other hand, it was reasonable to believe that the policy extended to a situation in which the accused was tried and acquitted by the state court. As a matter of fact, that was the precise determination by the Secretary of the Navy some months after the trial. In a letter of instruction to all ships and stations (SECNAV INSTRUCTION 5810.1 JAG:I:2 CT:au 5 March 1953) he said:

"Subj: Policy regarding trial by courts-martial of persons previously tried by civil courts for the same act or acts.

"Ref: (a) CMO 5–1945, 203.

"1. *Purpose.* The purpose of this

Instruction is to modify the policy set forth in reference (a) regarding trial by courts-martial of persons in the naval service who have previously been tried in civil courts for the same act or acts, and to provide procedures to be followed in carrying out the modified policy.

"2. *Modified Policy.* A person in the naval service who has been tried in a State court, whether convicted or acquitted, shall not be tried by court-martial for the same act or acts except in those unusual cases where trial by court-martial is considered essential in the interests of justice, discipline, and proper administration within the naval service. Such unusual cases, however, shall not be referred to trial without first obtaining permission from the Secretary of the Navy. Requests for permission to refer such unusual cases to trial shall include a full report of all the attendant circumstances and shall be forwarded to the Secretary via the officer having general court-martial authority over the command, and the Chief of Naval Personnel or the Commandant of the Marine Corps, as appropriate."

It may be that the convening authority believed that the Navy policy should not be applied. But in any event, a departure from a service policy would not prevent application of specific provisions of the Code or Manual. United States v. Gomes, 3 USCMA 232, 11 CMR 232. However, that is not the issue here. The real question is whether, in the view of the Navy policy, it was reasonable for the law officer to grant a continuance until the Secretary of the Navy could reply to the accused's request. We think that it was.

The Government argues that the convening authority acted in the best interests of the command. Perhaps he did. But that is beside the question. The Manual expressly provides that "he cannot control the exercise by the court of the powers vested in it by law." Manual, supra, paragraph 5a(6), page 8. His action constituted illegal interference with the law officer in the exercise of his judicial functions. This interference resulted in prejudice to the accused by depriving him of the opportunity of having the Secretary of the Navy consider his request for the termination of further proceedings against him, which we regard as a substantial right.

The decision of the board of review is reversed and a rehearing is ordered.

BROSMAN, Judge (concurring in the result):

I fully agree with the result reached by Chief Judge Quinn in this case. However, I prefer to bottom my vote for reversal on the notion that general prejudice enters the picture when a convening authority interferes—as he did here—with the law officer's ruling on a continuance.

II

The dissenting judge has relied heavily on paragraph 67f of the Manual for Courts-Martial in determining the issues here. The principal opinion, it is true, does not treat in detail of this paragraph. However, I feel sure that this course was followed in the belief that its provisions are demonstrably inapplicable to the instant case. Certainly they are. This might be surmised from the fact that the Manual purports to deal with continuances in a wholly different paragraph and chapter. See paragraph 58. Moreover, the Manual speaks not of a *motion* for continuance, but solely of an *application* therefor. Ibid. This circumstance suggests that Judge Latimer can gain but modest comfort from what is said of the effect of rulings on *motions* in paragraph 67f. Also, I note that in paragraph 67g the Manual states that certain matters "are not proper subjects for motion prior to plea, however much they may constitute ground for a continuance." This statement makes clear beyond peradventure that, in dealing with the convening authority's power to obtain reconsideration of a court's ruling on a motion, the Manual's draftsmen had no purpose to deprive the law officer of his power to make the final determination as to continuances. Accordingly, I feel no sort of necessity to inquire whether —had the Manual taken Judge Lati-

mer's position—conflict would have existed with the following mandate of the Code: "The law officer of a general court-martial . . . shall rule upon *interlocutory* questions, other than challenge, arising during the proceedings. Any such ruling made by the law officer of a general court-martial upon any *interlocutory* question other than a motion for a finding of not guilty, or the question of accused's sanity, shall be *final*." Article 51(*b*) of the Code, 50 USC § 626. (Emphasis supplied.)

The Manual provides additionally that the "law officer rules *finally* on any application for a continuance presented while the court is in session." (Emphasis supplied.) Paragraph 58*b*, supra. There is no doubt that the law officer's determination of the desirability of a continuance in the case at bar was made while the court-martial was in session — yet somehow the dissenting judge concludes that the word "finally" does not in any way foreclose the convening authority's intervention for the purpose of directing the law officer to proceed with the trial. I see no foundation in the wording of either Code or Manual for this interpretation. Also, in paragraph 58*e* of the latter source it is remarked that an application for extended delay "may be referred . . . to the convening authority." "May" is normally taken to indicate mere permission. See United States v. Merritt, 1 USCMA 56, 1 CMR 56. Thus, its use connotes that the court-martial — through the law officer —enjoys the election to refer or to refrain from referring the matter to the convening authority. Here the law officer did not choose to refer—and thus he exercised the privilege granted him by the Manual. The convening authority deliberately overrode that choice—and thus, in my view, infringed the orderly procedure of courts-martial through the use of "command control", or something very like it.

Of course, the Manual provides that a continuance must be sought from the convening authority when the court is not in session. Paragraph 58*e*. I see nothing inconsistent with my position in the circumstance that the expense

and inconvenience of reassembling a court-martial from adjournment may be avoided in this manner when grounds for a continuance are made manifest to the convening authority. If he grants the continuance, I doubt that complaint would be made. If, on the other hand, he denies it, a new application therefor may be made in open court. At that time—in my understanding—the law officer is permitted to make an independent determination of the desirability of granting the application. Accordingly, under this procedure the accused is in no way deprived of his right to have the law officer rule finally on any request made by him for a continuance. In the case at bar the convening authority's action completely destroyed that right.

## III

Judge Latimer has emphasized that he knows of "no trial judge who is not subject to some supervision and control by a superior court." As he must also know, an appellate court, in the exercise of that supervision and control, does not as a usual thing review interlocutory rulings at the time of their rendition. See 28 USC §§ 1291, 1292; Bankers Life & Casualty Co. v. Holland, 346 US 379, 98 L ed —, 74 S Ct 145; Roche v. Evaporated Milk Ass'n, 319 US 21, 30, 87 L ed 1185, 1193, 63 S Ct 938; Cobbledick v. United States, 309 US 323, 84 L ed 783, 60 S Ct 540; American Construction Co. v. Jacksonville, T. & K. R. Co. 148 US 372, 37 L ed 486, 13 S Ct 758; Georgia Ry. & Power Co. v. Decatur, 262 US 432, 67 L ed 1065, 43 S Ct 613; 2 Am Jur, Appeal and Error §§ 21–27. So far as I can determine, action on an application for a continuance is generally viewed as interlocutory in character. Cf. Bedgisoff v. Cushman, 12 F2d 667 (CA9th Cir). Thus, in the civilian scene the ruling on such a request could not in most instances be the subject of appellate consideration until the termination of the case. Thus too, the "superior court," of which the dissenting judge speaks, would not at all be in the position of considering the question of the grant of a continuance at the stage of the pro-

594

ceedings at which the convening authority intervened here.

Perhaps the issuance of a writ of mandamus by an appellate tribunal would constitute the closest civilian analogy to the convening authority's action here. Indeed, there have been instances in which mandamus was issued for the purpose of compelling a court to proceed with the trial of a case following the grant of a continuance. For example, after a continuance of almost four years' duration, a Circuit Court of Appeals granted a writ to compel the District Court to proceed to trial. Bedgisoff v. Cushman, supra. The continuance there—interestingly enough—had been granted by the District Judge in 1921 to run until such time as the United States should recognize the Russian Government—an event well within the unpredictable and uncontrollable future. More applicable here than that precedent, however, are the numerous decisions denying mandamus sought for the purpose of reviewing interlocutory rulings. The Supreme Court—since the days of Marshall—has deemed such action to be inappropriate, and has thought that it would lead to premature decisions, and "would subvert our whole system of jurisprudence." See American Construction Co. v. Jacksonville, T. & K. R. Co., supra. Such a writ may not be resorted to for the purpose of controlling minor orders made in the conduct of judicial proceedings —and the circumstance that the results of litigation may possibly render the interlocutory proceeding valueless does not serve to justify the exercise of this prerogative power. Ex parte Wagner, 249 US 465, 63 L ed 709, 39 S Ct 317. Being extraordinary remedies, writs of mandamus "are reserved for really extraordinary causes." Ex parte Fahey, 332 US 258, 91 L ed 2041, 67 S Ct 1558. The possible inconvenience of proceeding to an unnecessary trial does not justify the use of mandamus. Gulf Research & Development Co. v. Harrison, 185 F2d 457 (CA9th Cir).

To me, the intervention of the convening authority here seems fully as extraordinary in nature as the issuance of a writ of mandamus—to which it is so closely analogous. If the civilian precedents mean anything, they signify that appellate intervention of such a nature is not justified—this despite the fact that the law officer may have erred palpably in his ruling. It may be argued that the present law officer's grant of continuance was, in reality, a final disposition of the case, since in his language he purported to adjourn the court *sine die*. However, I should say that in our analysis of the effect of his action, we must penetrate form to reach substance. See, e.g., Baltimore & O. R. Co. v. United Fuel Gas Co., 154 F2d 545 (CA4th Cir). On doing so, it is to be perceived at once that the continuance was intended to cover only such a period as would be required to obtain a response from the Secretary of the Navy to the letter addressed by the accused to him. The indefiniteness of time involved in obtaining such an answer is scarcely on a par with that contemplated in the grant of a continuance until such time as the United States should recognize the Russian Government—there being at the time of the grant no indication that recognition would ever occur. See Bedgisoff v. Cushman, supra.

Indeed, I find no reason for supposing that it should have taken more than a few days to obtain an indication of the views of the Secretary—especially had the convening authority, the Commandant of a Naval District, been willing to devote to the task of securing a reply a zeal equal to that displayed in ordering renewal of the trial. After all— as Naval directives make clear—in military justice affairs no insurmountable barrier separates the Secretary of the Navy and his Judge Advocate General from the "field." See, e.g., Chapter VII, Naval Supplement to the Manual for Courts-Martial, United States, 1951, especially paragraphs 0701, 2, 5, 7, 8. The Secretary was part of the same Armed Force and legal system as were the members of the court-martial, and presumably he possessed an interest equal to theirs—and to that of the convening authority—in speeding the disposition of the accused's case. No possibility of hardship to the Government is visible in the grant of the continuance here—a possibility which, had it exist-

**595**

ed, might supply the "extraordinary" circumstances on which a writ of mandamus must be predicated. Prosecution witnesses were for the most part policemen residing in San Diego, California, where the case was tried — and there was no indication that any of them were planning a departure from the State and would thus be unavailable for later appearance.

Search as I will, I find literally nothing in the civilian legal area to sustain the position of the dissent. Nor can I possibly see why "piecemeal appeals" should be favored in military tribunals when frowned on—even scowled at—by civilian courts. Cobbledick v. United States, supra; City of Morgantown v. Royal Insurance Co., 337 US 254, 93 L ed 1347, 69 S Ct 1067; Kuhn v. Canteen Food Service, 150 F2d 55 (CA7th Cir); Lewis v. E. I. Du Pont De Nemours & Co. 183 F2d 29 (CA5th Cir). Moreover, I can recognize without difficulty the applicability to the present situation of the Supreme Court's point that writs of mandamus should be granted with extreme caution because "they have the unfortunate consequence of making the judge a litigant." Ex parte Fahey, supra. Here similarly, the law officer — the "judge" of the court-martial — was placed on the defensive by the convening authority, and thus became to some extent personally involved in the litigation.

It is undoubtedly true that in the military legal system there is greater possibility of injury to one side or the other, arising from the grant of protracted continuances, than is likely in civilian law administration—since both court members and prospective witnesses may become unavailable after a brief lapse of time either through transfer or because of death in combat. When such risks of unavailability are fairly presented, there might well exist those "extraordinary" circumstances which—in line with civilian precedents concerning writs of mandamus—would serve to justify a convening authority in overruling the grant of a continuance by a law officer, to the extent, of course, that the grant involved a clear abuse of discretion. However, it cannot be denied that the military system also presents unique dangers arising from an improper intervention by the convening authority in the grant of a continuance.

It was doubtless with an eye to those dangers that defense counsel here moved for a "mistrial" after the convening authority's letter was read to the court-martial. He insisted then that the law officer had been "reprimanded" in violation of Article 37 of the Uniform Code, 50 USC § 612. Under all of the circumstances, I would not be willing to term the convening authority's letter a reprimand, or even a censure, within the meaning of the Code. However, I am not sure that I could not find an attempt on his part by "unauthorized means" to "influence the action" of a court-martial, in violation of that same Article. To my mind, the Congressional mandate against "command influence" is so significant and compelling as to demand reversal, even though the "action" here "influenced" —or, better said, directed—related to no more than the granting of a continuance.

Moreover, the intervention of the convening authority in this case distinctly and improperly discredited the law officer in the eyes of the members of the court—for it connoted that the convening authority lacked confidence in the ability of an official he had appointed, and who had been certified as competent by The Judge Advocate General. Judge Latimer has pointed out that "Abuse of discretion as used in the law implies neither incompetence, bad faith, misconduct, nor any reflection on the law officer." To this I must reply that the convening authority's comment could scarcely have been considered a compliment—had it been expressed to lawyers only. However, the members of the court were presumably laymen. And who can say what overtones of depreciation the condemnation of the law officer's "abuse of discretion" may have implied in their minds? I doubt that a civilian jury would have the opportunity to hear a like criticism by an appellate tribunal of a civilian judge during the course of a trial. I question, too, whether such treatment of the law officer in the presence of members of

the court, his "jury," squares with the Congressional intent to erect in the person of the law officer an official as similar as possible to the civilian judge—not only in function, but presumably also with respect to dignity and stature in the court's eyes.

Further, it is evident that Congress wished to free court members from preoccupations with the wishes or beliefs of the commander who appointed the tribunal. Guilt or innocence is to be determined by their judgment, not his. Aside from the impression that the law officer here was an incompetent bungler whose views merited little attention, the members of the court may also have received the impression that the convening authority was actively interested in the outcome of the trial. Else why was he following it so closely—even to the point of scrutinizing the interlocutory rulings of the law officer? A court member might also reason that the principal result of delaying trial until arrival of the Secretary's response would be to afford the accused better odds—since through it he might even avoid trial. The next inferential step would take the form of an interpretation that the convening authority wished to deprive the accused of that possible benefit by the direction of an immediate trial. And from this the conclusion might follow that the former desired to eliminate that possibility in order to facilitate conviction. Such inferences may—indeed, undoubtedly do —depart wholly from what the convening authority had in mind. This, however, is unimportant if his actions in connection with the trial might reasonably have operated to lead court members to infer either that he believed the accused guilty or desired that he be convicted.

It is difficult to measure the effect of such intangibles in the instant case. The evidence against the accused met more than minimum standards of sufficiency. Yet the court did not quickly bring in findings of guilty—presumably because of the accused's sworn denial, his prior acquittal by a civilian jury, and the mass of character evidence in his favor. When, as here, the scales are not overbalanced in favor of guilt,

the prejudicial effect of the convening authority's action may be especially strong. But I do not feel impelled to go further in delineating the risk of specific harm—for I must apply general prejudice unhesitatingly in the area of "command influence."

IV

The dissenting judge announces that he finds "no logic, reason, evidence or basis for the ruling of the �these law officer." It is to be noted that an inquiry into the reasonableness of the action on the application for a continuance is not demanded under my analysis—for, in my view, even an egregious error by the law officer, without more, would not permit the convening authority's intervention for the purpose of directing retraction of an interlocutory ruling. However, I cannot brand this law officer's action as an abuse of discretion. Of course—as the dissent points out— it was not until after the time of the accused's trial that the Secretary of the Navy directed explicitly against trial for the same offense following acquittal by a civilian court, in the absence of "permission from the Secretary of the Navy." Nonetheless, I agree with the Chief Judge that the law officer here could quite reasonably have understood that Navy policy, as previously proclaimed, embraced the situation of the present accused.

The board of review — presumably well acquainted with Navy policy concerning the trial of personnel previously charged in state courts — asserted that "In an appropriate case this policy would be extended to include those *acquitted* in a civil court." (Emphasis supplied.) This statement makes clear that, in the board's eyes, the applicability of the policy was not limited to previous *convictions* by state tribunals.

True it is that the board did not think that the accused's was an "appropriate case," in light of the Navy's policy regarding the discharge of homosexuals—and I cannot say that the Secretary of the Navy would not have taken a similar stand. It must not be overlooked, however, that the desire to dispose of

homosexuals does not inevitably dictate their trial by court-martial—for, as is common knowledge, administrative discharges are often used to cleanse the services of these undesirables. But, even if he concluded that policy did seem to demand trial of the accused by court-martial, the law officer might reasonably have believed that there existed a policy conflict which the Secretary of the Navy should resolve. In view of the circumstance that securing a reply from the Secretary need have taken but a short time, the abuse of discretion is even less clearly demonstrated. Thus, while I would have found no error had the law officer denied the continuance application, I cannot at all concur with the convening authority and the dissenting Judge in denominating his ruling an abuse of discretion.

### V

Certain remarks in the dissenting opinion demand specific rebuttal. For instance, the author comments that, if the law officer's position had been left unaltered by the convening authority, "the channels of communication will bog down with solicitations for prevention from prosecutions." It is to be observed that a similar argument was addressed by trial counsel to the law officer. The latter reasoned—more soundly than my brother, I believe—that the situation facing him was not the *usual* one, and might therefore, within the proper exercise of discretion, demand specialized treatment. I observe, too, that in its more recent policy directive, the Navy appears determined to "bog down" its channels, not with solicitations from accused persons, but rather with command communications to the Secretary requesting permission to prosecute sailors who have been either convicted or acquitted by state courts.

The dissent also protests that courts-martial, like civilian judicial agencies, will shortly be faced with "delay in disposing of criminal litigation." I must concede that the expeditious handling of court-martial trials is especially important in the Armed Forces—and that Congress, too, has condemned "unnecessary delay" in military justice. Uniform Code, Article 98, 50 USC § 692.

However, it is inevitable that some of the safeguards now granted an accused by the Uniform Code—protections in most instances patterned on civilian practice—will occasionally result in less expedition than heretofore. Presumably Congress was aware of this circumstance—and it is now this Court's duty to execute the legislature's mandate—even if, as here, the result is a longer trial than a convening authority may desire. See Roche v. Evaporated Milk Ass'n, supra. Furthermore—and while speed is appropriate—both civilian and military tribunals have recognized the compelling need to avoid "the haste of the mob." See Powell v. Alabama, 287 US 45, 77 L ed 158, 53 S Ct 55; United States v. Fletcher, 6 CMR 163.

### VI

Certain procedural slips by the law officer and an abundance of zeal on the trial counsel's part marked the instant trial. Perhaps its proceedings would have taken the same direction had the law officer and counsel not felt that the convening authority was looking down their very throats and measuring every word they spoke. But the unfortunate circumstance that the convening authority had previously and openly damned one of these functionaries as an abuser of discretion gives the conduct of the trial an especially unpleasant aroma. Viewing the record as a whole, I am fortified in my belief that the appearance of "command influence" is vivid enough here to require reversal.

LATIMER, Judge (dissenting):

I dissent.

Because the principal opinion so scantily touches on the facts of this case, I prefer to make a more complete recitation. The chronology of events shown in the record establishes that appellant was arrested by civilian police on January 12, 1952, for having committed an act of sodomy. He was released on bond and permitted to return to his post of duty. A pretrial investigation was held by naval authorities which resulted in a recommendation, dated February 11, 1952, that appellant

be tried by general court-martial. On February 19, 1952, the convening authority referred the case to a general court-martial for trial. Thereafter, appellant was tried by the State of California for the offense and on April 4, 1952, he was acquitted. On May 5, 1952, after learning that his general court-martial case had been set for trial on May 15, 1952, the accused addressed a communication through channels to the Secretary of the Navy requesting the latter to intervene in his behalf. The reason for the request was that counsel for the accused, knowing that double jeopardy was not available as a legal defense, cherished a hope that the Secretary of the Navy might be more generous than the law and order the proceedings stayed. The letter was received by the convening authority on May 15, 1952, and forwarded with an adverse recommendation.

The general court-martial convened on May 21, 1952, and during his arraignment accused moved that the charge be dismissed on two grounds: first, double jeopardy, and, second, that it was contrary to the policy of the Navy to try a man for the same offense for which he had been previously tried by civilian agencies. The law officer denied the motion, whereupon the defense counsel countered with a motion for a continuance based on the reason that the accused had addressed a letter to the Secretary of the Navy requesting his assistance in disposing of the litigation favorably to the accused, and a reply thereto had not been received. In making this motion, defense counsel made it certain that the accused was not seeking relief because he needed additional time to prepare for trial. This is understandable in view of the fact that some fifty-five days' delay were at his request. The sole predicate for the motion was that accused was entitled to delay the trial until he had received a ruling from the Secretary of the Navy on his claim of double jeopardy. The law officer heard arguments on the motion, but he did not rule thereon. He merely informed the president of the court-martial that he thought an adjournment sine die would be proper and he so recommended. The president of

the court followed the recommendation and entered an order to that effect. The court met again on May 26, 1952, because of having received a communication from the convening authority in which it was stated that the ruling of the law officer on the motion was an abuse of discretion. The letter contained a direction to proceed with trial unless other valid reasons existed for a continuance.

There are some facts which, if emphasized, will bring the issue into bold relief. The motion for a continuance was made on May 21, 1952. At that time the Navy had a policy regarding trial by court-martial of persons previously tried by civilian courts for the same act. That policy is referred to in 5 CMO (1945) 203, and in substance it was that a person in the naval service who had been tried in a state court, convicted and punished, should not be tried by a court-martial for the same act. It is to be noted that this policy applied only when the accused had been convicted and punished and, in this instance, he escaped both. Another Department of the Navy policy of some importance to this case is one which declared that persons with homosexual tendencies should be eliminated from the naval service. On March 5, 1953, some ten months after the trial of this case, the Navy Department modified the first mentioned policy rule by providing that a person in the naval service, who had been tried in a state court, and either convicted or acquitted, should not be tried by court-martial for the same act except in unusual cases where trial was considered essential in the interests of justice, discipline, and proper administration. The unusual cases were to be referred to the Secretary of the Navy for determination. Accordingly, it is to be observed that, at the time the motion was made, there was no basis in law or in policy for not trying this accused. On the contrary, in this class of offenses the policy was either to discharge administratively or try the offenders.

It seems to me that the fundamental issue in this case is one of procedure

which is controlled by both the Code and the Manual. Judge Brosman, in order to reach the claimed error, falls back on the chimerical doctrine of general prejudice, while the Chief Judge relies on specific prejudice. I hope to answer both; but to place the case in its true perspective, it is only necessary that we ascertain whether the means by which the conviction was reached meet the standards of fairness prescribed by military law. The mere fact that the accused was found not guilty in a civilian court does not require favorable treatment in a military court particularly where, as here, the facts overwhelmingly establish the offense.

I shall first answer the Chief Judge's contention on specific prejudice. He makes two assumptions which I believe to be unwarranted. The first deals with the Navy policy which provides that naval personnel will not be released to state officials for trial in a state court without specific authorization from the Secretary of the Navy. From this policy requirement, he reasons that the convening authority acted in accordance with the declaration and released the accused to California authorities. I sense he mentions that policy to suggest the convening authority had the first opportunity to proceed with the litigation, and he forfeited the right of the Government to proceed with trial by releasing the accused to the civilian authorities. Even were I to assume there was some merit in that proposal, I cannot overlook an important part of the record which shows the accused was arrested by civilian police and retained in civilian custody. I quote from the first part of his letter which he offered in evidence:

"On 12 January 1952, I was arrested in the city of San Diego by San Diego Police Officers and accused of committing an act of sex perversion. Because I was on authorized liberty from the U. S. Fleet Training Group and Underway Training Element, San Diego, and further because I was the only Naval Personnel involved in the alleged incident—the other accused party and the witnesses were civilian—it was apparent from the onset that the local civil authorities would exercise jurisdiction on this charge. When I was released from civil restraint on 14 January 1952 after posting $1,000 bail and returned to my duty station, I was surprised to discover that my command in behalf of the Government was preparing an investigation of the same charge with a view to try me by General Court-Martial."

The accused testified he was confined by military authorities and that on only two occasions was he allowed to leave his restricted area. The first time was to permit him to be present at the preliminary hearing and on the second occasion he attended his trial in the state court. That is a far cry from releasing him to civilian authorities. It appears to me the civilians acquired control and retained it. To allow an accused to appear, and thereby prevent his bond from being forfeited, would not require authorization by the Secretary of the Navy.

The second erroneous assumption is that the naval policy declaration which was limited to guilty verdicts or pleas could be extended ex post facto to cover cases in which the accused was found not guilty. This policy, which is seized upon to assist the accused, was not adopted until some ten months after this trial, and I am certain neither the law officer nor the convening authority can be credited with knowledge of its subsequent adoption. There is a substantial difference in the two declarations, and I know of no way in which the accused can claim error because the benefits of the later one were not conferred on him. The former bars double punishment only, while the latter stays a second trial except in unusual cases; parenthetically, I might add this appears to be one of that type. Stated succinctly, the rationale of the Chief Judge's opinion is supported by a mistaken belief that the accused was prejudiced by the denial of a substantial right. I ask: At the time which concerns this case, what right was denied him? The answer in the principal opinion is the right to correspond with the Secretary of the Navy and receive

a reply before the Government can prosecute, when no policy nor legal privilege is being abridged. Under that concept, the law officer would have erred in denying the motion for a continuance as he could not have ordered the trial to proceed until the Secretary of the Navy had replied without denying the accused the same right. If that is a privilge which runs to this accused, then any person in the military service cannot be brought to trial until he has been afforded the opportunity of writing to, and receiving an answer from, the appropriate Secretary of the Department. I can discard frivolous requests and yet make a reasonable assumption that, in the future, the channels of communication will bog down with solicitations for prevention from prosecutions.

Before presenting my objections to the application of general prejudice, a doctrine which I am forced to accept as the law of this Court, I believe a few general observations are apropos. We have likened the law officer in the military to a judge in the civilian system. I believe that proper when it is possible to equate them and have the military system operate with efficiency and dispatch. In this particular instance, bearing in mind the powers granted the convening authority, I am willing they should be likened, as I know of no trial judge who is not subject to some supervision and control by a superior court. He can be prohibited from issuing orders which are in excess of his authority, and he can be compelled to perform acts which he is required by law to execute. If he abuses his discretion in making a particular ruling, then the higher court can reverse the ruling or direct that he do so. As an abstract proposition, I fail to see why those principles tailored to meet the exigencies of the service, cannot be applied in the military and, as I will later argue, Congress decreed their application. The convening authority has more powers than an appellate court, and good legal management requires that he exercise some supervision and control over the administration of the court-martial. His should not be a one-sided function. Primarily he should protect the rights of the accused; but the order-

ly and proper administration of military justice requires that the accuser's rights be likewise guarded. In this connection I can do no better than refer to the words of wisdom spoken by Mr. Justice Cardozo in Snyder v. Massachusetts, 291 US 97, 122, 78 L ed 674, 686, 54 S Ct 330: "But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

I have long believed that each party to a law suit is entitled to a fair and speedy trial, and this is particularly desirable in the military system. Civilian courts are continually condemned for their delay in disposing of criminal litigation, and I regret to see delaying tactics creep into the military system. Obviously one accused of a crime should be given ample time and opportunity to prepare his defense, but that does not concern us here. Particularly is expeditious processing of criminal cases necessary in the armed forces to maintain discipline and morale. One need have little foresight to know that if the saying "justice delayed is justice defeated" can be applied truly to the military system, it too will be condemned. Why then should a contumacious law officer who, assuming arguendo, refuses improperly to permit a case to be tried, be untouchable? Is there no military court or other authority who can compel him to proceed? If not, then the Uniform Code of Military Justice is woefully inadequate. Unfortunately by this decision it is, as the authority who is responsible for the administration of law enforcement in his command has been denied the right to control the affairs of the court-martial he appoints. Perhaps my associates would say he has the right, but it must be exercised by removing the law officer or appointing a new court. As for me, I would shy away from that concept because that method is infested with the very vice we seek to prevent.

Historically, the convening authority has been a very important person in the military court-martial system. Over the years there has been a diminution of those powers; but to let him partici-

pate to the extent of controlling some of the administrative matters of the court-martial does not offend against any principle of justice so rooted in the traditions and conscience of the people as to be ranked as fundamental. I have the present Code to support me in that statement. A convening authority is given the power to determine severity of the crime for which the accused must stand trial; he determines the class of court-martial that will hear the case; he can, by his order, render a capital case noncapital; he appoints individual members of the court-martial; he designates the law officer; he appoints trial and defense counsel; he may withdraw specification; and he may terminate the trial for military necessities and order it tried at a subsequent time. With all of those powers at his command, the risk of prejudice by command control, exercised assertedly through overruling a law officer on a motion, is indeed shadowy. More summary and effective means are available to a convening authority if he is disposed to interfere with a court-martial, but I much prefer not to force their use. My preference is to encourage an orderly procedure which requires the officer to place on record his reasons for intervention.

While I· have dealt in the abstract with the powers of the convening authority, I will narrow my discussion to those exercised in this particular case. We can set aside accused's contention of double jeopardy as the law and the Manual are contrary to his assertion. The sole issue then is the right of the convening authority to reverse a ruling of a law officer on a motion for a continuance, unsubstantiated by law, policy, or lack of readiness or preparation for trial. A reading of the Code and the Manual convinces me that he has been vested with that authority, and while I could quote one subparagraph from the latter to support my conclusion, I prefer to develop my reasons in some detail.

The Code provides that a court-martial may, for reasonable cause, grant a continuance to any party. It also provides that the law officer rules finally upon interlocutory questions, and a motion for a continuance falls in that cate-

gory. The Manual for Courts-Martial, United States, 1951, so interprets the Code provisions, as it states the law officer rules with finality on a motion for a continuance made while the court is in session. The finality of his ruling, however, is intended to bind only the members of the court-martial and not the subsequent reviewing authorities. The purpose for fixing responsibility is to prevent divided authority during the trial and preclude the members of the court-martial from reversing the ruling of the law officer. Because of administrative matters involved in the continuance, the Manual suggests the law officer consult with the president of the court. While the law officer ·abdicated his right in this instance and permitted the president of the court to make the ruling, that fact is of little significance to the immediate question. It is, however, important to note that the convening authority rules on the application when the court is not in session and, if the continuance is for an extended period, the cause may be referred to him for decision. The reason for the latter provision is that there are many other administrative details interwoven with a lengthy delay. A decision on discharging the court, dismissing the specifications, reducing the charges, or taking other action which is beyond the powers of the law officer or the court-martial, may be necessary. I mention these possibilities to point out that the Manual acknowledges the superior position occupied by the convening authority in dealing with some of the problems posed by granting a prolonged or uncertain continuance.

I am at a loss to understand why the convening authority's act in this case so severely shocks my associates. The new Code did not strike down all previous military judicial concepts and principles. The Code, in at least one place, recognizes the right of the convening authority to overturn the ruling of a law officer. Article 62(a), 50 USC § 649, provides as follows:

"If a specification before a court-martial has been dismissed on motion and the ruling does not amount to a finding of not guilty, the convening authority may return the record to

the court for reconsideration of the ruling and any further appropriate action."

If Congress permitted intervention in one area, then the President, when he authorized the same powers in other areas, was not enacting rules and regulations contrary to the Code or in violation of some inalienable right of an accused person. He was doing precisely what Congress directed him to do. At this point it might be well to consider the convening authority's powers in insanity proceedings. We have already placed our stamp of approval on his authority in that area. Paragraph 120c, Manual for Courts-Martial, United States, 1951, provides that no person shall be brought to trial unless he possesses sufficient mental capacity to understand the nature of the proceedings against him and intelligently to conduct or cooperate in his defense. I turn to paragraph 122b of the Manual in an endeavor to prove that the ruling of the law officer is not inviolable. That paragraph provides as follows:

"If the issue of insanity is raised as an interlocutory question and the court finds the accused sane, the defense is not precluded by this finding from offering further evidence on the issue of insanity and, when all the evidence in the case has been received, the court may proceed to its findings on the guilt or innocence of the accused. In consideration of its findings upon the general issue, if the court entertains a reasonable doubt that the accused was mentally responsible for his acts, it will enter findings of not guilty as to the proper charges and specifications (120b).

"If the convening authority disagrees with the court in its finding that the accused lacks requisite mental capacity at the time of trial (120c), or if the convening authority determines that the disability was temporary and that the accused has recovered his mental capacity, he may return the case to the court with instructions to reconsider its findings and, if appropriate, to proceed with the trial."

In the two above-quoted provisions we have respectable authority, binding on us, which demolishes the argument that when a convening authority disagrees with the court or law officer, it is such a vice that we can close our eyes to prejudice and figuratively toss a conviction out the window. Again, the President prescribed many other important areas in which a convening authority could review and reverse the ruling of a law officer. Paragraph 67f of the Manual, which is of particular moment in the instant case, is one which my associates entirely misinterpret. If language of that paragraph means what it states unequivocally, then a convening authority has the right to overturn the ruling of the law officer on any motion, or his decision on a matter of administration, which does not amount to a finding of not guilty. That paragraph should remove any lingering doubts as to the power of this convening authority to follow the course he pursued. It provides:

". . . But when the trial cannot proceed further as the result of the action of the court on a motion raising a defense or objection, the court will adjourn and submit the record of its proceedings so far as had to the convening authority.

"The convening authority may not return to the court for reconsideration a ruling of the court which amounts to a finding of not guilty, such as the granting of a motion to dismiss because of lack of mental responsibility at the time of the offense (120b), or the granting of a motion for a finding of not guilty (71a; Art. 62). *As to motions granted by the court which do not amount to a finding of not guilty, the convening authority may, if he disagrees, return the record of trial to the court with a statement of his reasons for disagreeing and with instructions to reconvene and reconsider its ruling with respect to the matters as to which he is not in accord with the court (Art. 62a). To the extent that the court and the convening authority differ as to a question which is solely one of law, such as whether the charges allege an offense cognizable by a court-martial, the court will ac-*

**603**

*cede to the views of the convening authority;* but if the matters as to which the convening authority disagrees are issues of fact, such as those which may be presented on an objection to trial on the ground that the accused lacks the requisite mental capacity at the time of trial (120c), the court will exercise its sound discretion in reconsidering the motion. The order returning the record should include an appropriate direction with respect to proceeding with the trial or any further appropriate action (Art. 62a)." [Emphasis supplied.]

One might entertain the view that the convening authority should be stripped of the power he has historically possessed, but that is a matter of policy which has been determined by Congress and the President. Certainly, in the face of the foregoing provision, this Court is in no position to deprive him of his authority by judicial legislation.

My associates counter the foregoing argument by contending that paragraph 67*f* of the Manual is inapplicable. The Chief Judge bases his views of their inapplicability upon his opposition to a piecemeal appeal. I have already pointed out several instances where that type of appeal is authorized. The concurring Judge supports his conclusions on that and the additional grounds that continuances are covered in a different paragraph and chapter of the Manual. Without belaboring the latter point, Chapter XII, which is entitled "Pleas and Motions" includes paragraphs 67 and 69. Subsection *e* of paragraph 69 recognizes continuances as being encompassed within that Chapter and it states:

"Miscellaneous motions for relief. —In addition to grounds for motions discussed above in this paragraph (69), there are others which may be made for the purpose of raising a specific objection on the merits prior to trial of the general issue. For examples, see 121 and 122 (Insanity). If a motion amounts in substance to an application for a continuance, or to a challenge, motion to dismiss, or other matter for which a procedure is provided, the motion will be regarded as such application, challenge, motion to dismiss, or other matter. A motion to elect—that is, a motion that the prosecution be required to elect upon which of two or more charges or specifications it will proceed—will not be granted."

The assertions to the effect that my interpretation of the Manual provisions possibly clashes head-on with the provision of the Code which states that the law officer rules finally on interlocutory questions is not sound. Both parties are entitled to make a motion for a continuance, and I think we can illustrate the point by hypothetical cases. Supposing the law officer improperly grants a continuance for the Government to the prejudice of an accused, is the ruling of such finality that the convening authority cannot reverse? Again, supposing the law officer refuses a defense request for a continuance which should have been granted, is the finality of that order such that the convening authority is powerless to correct the error? If so, then I fail to understand our rulings in United States v. Nichols, 2 USCMA 27, 6 CMR 27; United States v. Plummer, 1 USCMA 373, 3 CMR 107; United States v. Sizemore, 2 USCMA 572, 10 CMR 70; and the provisions of the Manual. The latter states that although the question of continuance is one for the sound discretion of the court, whenever it appears that the court has abused its discretion and denied the accused a reasonable opportunity to perfect his defense the proceeding should be disapproved. If the wording of the Code, which states that the ruling of the law officer on interlocutory matters is final, applies to any forum or reviewing agency other than the court-martial itself, then our previous decisions are incorrect. If, on the other hand, it amounts to no more than a ruling by the court, then it is subject to review by the convening authority. The Code only makes the ruling binding on the court-martial as it provides the ruling of a law officer on an interlocutory matter shall constitute the ruling of the court.

The truth of the matter is that neither of my associates can dispute the power of the convening authority to correct an erroneous ruling against an ac-

cused. I am certain that if he were to interfere before findings to protect the interest of one on trial, they would not hold he had abused his discretion, and the argument that it was piecemeal would be dismissed summarily. The focal point, and the one upon which we cross swords, is whether he has any authority to protect the interest of the armed services. My views are that the prosecution has some rights in the military judicial system and a convening authority has some obligation to see that it is treated justly.

The Chief Judge seems inclined to the view that a convening authority may have some power to take corrective action, but that he can only interfere when the case reaches him on final review. That argument is a combination of sophistry and futility. The case on final review can only reach the convening authority after findings and sentence, if the latter is imposed. After the court-martial returns a finding of not guilty, the only reviewable issue is jurisdiction and an erroneous ruling for or against either party cannot be reached. If a finding of guilty is returned, can the prosecution complain about an adverse ruling? The answer is obvious, and the Government is left without recourse. Accordingly, my conclusion is that, under the ruling as announced, the convening authority is denied the right to correct any injustice if the Government is the loser. That denial may be of more importance when transplanted into special court-martial cases which are controlled by presidents not normally trained in the law.

The concurring Judge announces a familiar rule when he discusses writs of mandate. They are extraordinary writs and are used sparingly in the civilian sphere, but even there the appellate body determines the necessity for the issuance. However, the military judicial system is faced with different problems from those in the civilian system and summary action is more important. In our scheme of appeal, special writs are unknown; but a convening authority, up until the present holding, has had the right to direct that cases be tried with dispatch. He is the administrator of the courts in his command and he should be unfettered in his administration so long as he does not attempt to influence the findings or the sentence. Historically he has always enjoyed that power, and I find nothing in the present Code which can be reasonably interpreted to strip him of his authority. On the contrary, the legislative history convinces me Congress refused to divest him of the power my associates now contend he does not possess. Furthermore, if it be conceded he has the power to interfere in an unusual case, then it would appear to me we should measure his participation by the test of whether this is that type of case and not by a blind denial that he has no right to intervene.

The majority of the Court leave open a decision on the correctness of the ruling of the convening authority. My views require an answer to that question. Obviously, had the accused made any reasonable showing justifying continuance, then the ruling of the convening authority might have been erroneous. While, as I contend, the Manual permits the convening authority the right to review any adverse ruling of the law officer, we have the power and duty to test the legality of his rulings. In United States v. Padilla, 1 USCMA 603, 5 CMR 31, we reviewed the decision of a convening authority when he improperly granted a rehearing on a jurisdictional issue. We search the entire record for errors of law and if any are committed by the various reviewing authorities, then we can apply corrective measures. Here, the record requires that I sustain the action of the convening authority.

I can find no logic, reason, evidence, or basis for the ruling of the law officer. There was no regulation nor policy pronouncement which authorized the accused to escape trial. He was prepared to go forward with his defense, albeit he desired to avoid prosecution; but he assigned no valid or legal reason. He was not denied an opportunity to develop and present his evidence; further time would not have strengthened his defense; and the Government gained no evidentiary advantage. Mere hope

that some higher authority will exercise his power to stay proceedings does not in law amount to reasonable cause. Abuse of discretion as used ▉▉▉▉▉ ▉ in the law implies neither incompetence, bad faith, misconduct, nor any reflection on the law officer. It means no more than that he arrived at an erroneous conclusion and judgment which is clearly against the logic, effect, and reasonable inferences of the facts presented in support of the matter presented. The problem of ascertaining when a ruling falls in that territory is not without difficulty; but in this instance the motion cannot be defended upon any ground except the bare possibility that the Secretary of the Navy might stay the proceedings. Whether he has ever acted for or against the accused is not reflected by this record; but, at most, the accused staked his showing on an imaginary result. The Code authorizes a continuance only when reasonable cause therefor has been shown, and I find this record fails to show that that standard has been attained. I, therefore, conclude the law officer abused his discretion.

One other assertion advanced by appellate defense counsel bears brief mention. It is contended that because the court-martial members were apprised of the comment by the convening authority to the effect that the law officer had abused his discretion, he, the judge in the military system, was discredited. This does not follow and the record bears evidence to the contrary. It must be remembered that the president, acting for the court-martial, not the law officer, made the decision. The reasons for recommending the continuance were developed for the benefit of the court-martial, and it requires a vivid imagina-

tion to conjure up a belittlement of the law officer by court members who concurred with him. Moreover, he was courageous enough to rule with the accused on many occasions; his rulings were fair and just; and counsel has not called attention to any trial incident which suggests remotely that he was in disrepute with the court-martial members because of his prior ruling. Furthermore, the instructions were complete and the rights of the accused protected. The court deliberated for an hour and twenty-five minutes, and appellate counsel's argument that the members of the court-martial were influenced in believing the law officer did not have proper knowledge of the law is forcefully answered by the record of trial. It does not reflect discredit on the law officer, and his performance before the court-martial would overcome any claimed innuendo flowing from the communication. If the phrase "abuse of discretion" connotes incompetency, then this Court, and many others, have been impugning unjustly the qualifications of other tribunals and officers. Prejudice to this accused from that source is imaginary and not real.

Lastly, I cannot accept the speculative view that legal slips, if any, made by the law officer in the trial of this case might possibly have been caused by the letter from the convening authority. I am firm in my convictions that once the actual trial began, his rulings were controlled entirely by his knowledge of the law and that the claimed command influence is visionary and not present in this record. Assuming that some of his rulings might have been erroneous, we could not find any of sufficient prejudicial effect to be made the basis for argument on appeal.